**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KAREEM MUHAMMAD, STANLEY PIERRE, and QASHONE MENCHAN, individually and on behalf of others similarly situated, | |
| Plaintiffs, | Case No. |
| v. | |
| OLD EMPIRE INC. and VIOR TRANSPORTATION INC. | |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Plaintiffs Kareem Muhammad, Stanley Pierre, and Qashone Menchan bring this case individually and on behalf of others similarly situated against Defendants Old Empire, Inc. ("Old Empire") and Vior Transportation, Inc. ("Vior") for breach of contract, common law fraud, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/2, and the Truth in Leasing Act ("TILA"), 49 U.S.C. § 14704(a)(2). Plaintiffs bring their claims as a putative class action.

**NATURE OF THE CASE**

1.     This case involves a classic bait-and-switch scheme meant to trick truck drivers and circumvent the lease protections of the TILA. Defendants advertised to the public, and promised Plaintiffs through their recruiters, that it would pay semi-truck owner-operators or lease-operators (hereinafter, "drivers")[1] between 80-88% percent of the revenue for each load they hauled under Old Empire or Vior's carrier license if the drivers rented a truck from Old Empire or Vior. Then, when Plaintiffs began work, Defendants consistently lied to Plaintiffs

_____

[1] Plaintiffs use the term "drivers" to refer to individuals who have "leased" their semi-truck to Old Empire to transport loads in interstate commerce.

about the real price of the load and paid them less than the agreed upon percentage of the loads they transported.

2.      Defendants violated the ICFA by intentionally misleading Plaintiffs about the amount of money Defendants would retain from each load that Plaintiffs transported if Plaintiffs leased a truck with Defendants. Defendants also breached their contracts with Plaintiffs and violated the TILA by paying Plaintiffs less than the agreed upon percentage of revenue Defendants received for each load that Plaintiffs hauled with their equipment. Defendants also committed fraud by sending Plaintiffs doctored rate confirmation sheets that contained fake load prices.

<u>**Parties**</u>

3.      Plaintiff Kareem Muhammad, a Pennsylvania resident, is an interstate truck driver. He has a CDL Class A license and worked for Defendant as an owner-operator from approximately December 2021 to February 2022. During all times that Muhammad worked for Defendants, he was not an agent of Defendants for the purposes of the TILA.

4.      Plaintiff Stanley Pierre, a Florida resident, is an interstate truck driver. He has a CDL Class A license and worked for Defendant as an owner-operator from approximately August 2020 to April 2022. During all times that Pierre worked for Defendants, he was not an agent of Defendants for the purposes of the TILA.

5.      Plaintiff Qashone Menchan, a North Carolina resident, is an interstate truck driver. He has a CDL Class A license and worked for Defendants as an owner-operator in February 2023. During all times that Menchan worked for Defendants, he was not an agent of Defendants for purposes of TILA.

6.     Defendant Old Empire is an Illinois business corporation with its principal place of business in Bensenville, Illinois. Old Empire is a federally regulated motor carrier providing transportation services to the shipping public.

7.     Old Empire is registered under MC-1041482, US DOT # 3289556. According to the SAFER – FMCSA management information systems, Old Empire reported that it operates two power units (semi-trucks) and one driver as of March 16, 2023. Further, Old Empire reported that it ran approximately 16 million miles in 2022.

8.     As of March 16, 2023, Old Empire's Operating Status is listed as "not authorized" in the SAFER – FMCSA management system. Upon information and belief, Old Empire was an "authorized carrier" within the meaning of 49 C.F.R. § 376.2(a) during some of the time period covered by the allegations in this Complaint.

9.     Defendant Vior is an Illinois business corporation with its principal place of business in Willowbrook, Illinois. Vior is a federally regulated motor carrier providing transportation services to the shipping public and is an "authorized carrier" within the meaning of 49 C.F.R. § 376.2(a).

10.     Vior is registered under MC-864072, US DOT # 2293628. According to the SAFER – FMCSA management information systems, Vior reported that it operates 21 power units and 22 drivers as of March 16, 2023. Further, Vior reported that it ran approximately 2 million miles in 2022.

## Jurisdiction and Venue

11.     The Court has subject matter jurisdiction over this action pursuant to the TILA, 49 U.S.C. § 14704 and 28 U.S.C. § 1331.

3

12.     Venue is proper in this jurisdiction under 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(a), (b), and (c) because a substantial part of the events and omissions giving rise to this action occurred in the Northern District of Illinois.

### Legal Standards

13.     The TILA and its implementing regulations govern the terms and conditions under which owner-operator truckers lease equipment to federally authorized motor carriers that transport freight in interstate commerce. *See* 49 U.S.C. § 14102(a); 49 C.F.R. § 376.12. TILA regulations require the motor carrier's equipment leases to disclose, in writing, the amount that the motor carrier will pay the owner-operator as compensation. 49 C.F.R. § 376.12(d). When the lessor's revenue is based on a percentage of the gross revenue for a shipment, the lease must specify that the carrier will provide the lessor a copy of the rated freight bill, or any other documentation actually used for a shipment containing the same information, before or at the time of settlement. *Id*. at 376.12(g). Finally, the regulations require the motor carrier to adhere to the terms of the lease. *Id.* § 376.12 (introductory paragraph).

14.     The ICFA prohibits both deceptive practices and unfair business practices, including unfair business practices that offend public policy. 815 ILCS 505/2; *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 417–18 (2002).

### Common Facts

**A.  Defendants Illegally Misrepresent Load Prices and Underpay Plaintiffs.**

15.     Defendants advertised on social media and other websites that it would pay drivers a fixed percentage of the revenue for each load they hauled under Old Empire or Vior's

carrier license. Plaintiffs responded to these advertisements and inquired about this opportunity with Old Empire or Vior.

16.     After Plaintiffs applied to drive for Defendants, an individual who introduced themselves as a recruiter for Defendants called them and told them they would be paid a percentage of the gross receipts for each load and directed them to attend orientation at Old Empire headquarters.

17.     Plaintiffs traveled to Defendants' headquarters, incurring costs to do so, based on Old Empire's promise that it would pay Plaintiffs a set percentage of the price of the loads they hauled.

18.     Plaintiffs each entered into substantially identical written contracts ("carrier agreements") with Defendants wherein the authorized carrier (Old Empire or Vior) agreed to pay the driver 88% of gross receipts. *See* Ex. 1.

19.     On February 10, 2023, one day after signing the carrier agreement with Vior, Menchan entered into a lease-to-purchase agreement with Vior wherein he agreed to pay a 20% "commission" on the value of a load. *See* Ex. 2. Under the agreement, Menchan also entered into a 36-month lease, paying an additional $1,470 for the first ten weeks and $950 following until he paid the full truck price of $105,840, at which point he would own the truck outright.

20.     Muhammad leased his truck from Old Empire at a price of $1,500 per week.

21.     During his contractual relationship with Defendants, Pierre drove two separate trucks, one of which he owned outright and another for which he obtained third-party financing.

22.     Plaintiffs had exclusive use of the semi-trucks they leased during their contractual relationships with Defendants.

23.     When Plaintiffs worked for Defendants, Defendants' dispatchers contacted Plaintiffs and offered them "loads" to transport at a specific price. Plaintiffs determined the amount of money they would receive for transporting the load by calculating a percentage of the price the dispatcher quoted.

24.     At all times, Plaintiffs reasonably believed, based on representations that Defendants made to them, that Defendants were paying them the agreed-upon percentage of the revenue Defendants received for each load that Plaintiffs hauled.

25.     Paying drivers based on a percentage of the price of the gross revenue the carrier receives for a load is the trucking industry's dominant model of compensating owner-operators who lease their trucks. As of 2021, three out of every four leased owner operators were paid based on a percentage of the carrier's revenue for each load.[2]

26.     Defendants misrepresented and under-reported the price of Plaintiffs' loads to Plaintiffs. Defendants then paid Plaintiffs their allotted percentage of the lower, underreported amount, in violation of its agreements with Plaintiffs.

27.     On April 4, 2022, Pierre delivered a shipment from Wood Dale, IL to Elyria, OH. Prior to delivering the shipment, Old Empire dispatcher Nate Jones emailed Pierre a secretly altered load confirmation sheet between Defendant Old Empire and broker Guthrie Trucking/Brokerage LLC. The falsified load confirmation stated that the price of the load was $1,200. Ex. 3. Later, on January 9, 2023, Guthrie Trucking/Brokerage LLC provided Pierre a copy of the unaltered load confirmation, which stated that the real load price was $1,400. Ex. 4.

---

[2] Driver compensation, part 3: Percentage is king for leased owner-operators, long after the rise of miles post-deregulation, Overdrive, https://www.overdriveonline.com/business/article/15066619/compensation-percentage-pay-dominates-among-ownerops.

Defendants under-reported the load price by $200, and Pierre relied on the falsified load confirmation to his detriment. He would not have agreed to take the load for $1,200 if he knew the shipper was actually paying Defendants $1,400 to transport the load.

28.     On November 22, 2021, Pierre delivered a shipment from North Charleston, SC to Lebanon, TN. On November 23, 2021, Old Empire dispatcher Nate Jones emailed Pierre a load confirmation sheet between Defendant Old Empire and broker Allen Lund Company. The subject line of the email read "Rayford RC SC-TN $1300 for yesterday," consistent with Pierre's prior understanding that he would be paid 88% of $1,300 for transporting the load.

29.     However, when Pierre clicked on the rate confirmation attached to this email, it stated that the broker was paying Old Empire $1,600 for transporting the load. Ex. 5. Later that day, Jones emailed Pierre a copy of an altered load confirmation from Allen Lund Company, which stated that the load price was $1,300. Ex. 6. The subject line of the email read "This is RC." Defendants under-reported the load price by $300. He would not have agreed to take the load for $1,300 if he knew the shipper was actually paying Defendants $1,600 to transport the load.

30.     On February 6, 2022, Muhammad delivered a shipment from Winchester, IN to Elyria, OH. Prior to delivering the shipment, Old Empire dispatcher Max Jones emailed Pierre a secretly altered load confirmation sheet between Defendant Old Empire and broker Pallet Central Enterprises, Inc. The falsified load confirmation stated that the price of the load was $2,300. Ex. 7. Later, on March 4, 2022, Pallet Central Enterprises, Inc. provided Muhammad a copy of the unaltered load confirmation, which stated that the actual load price was $3,000. Ex. 8. Defendants under-reported the load price by $700, and Muhammad relied on the falsified

load confirmation to his detriment. He would not have agreed to take the load for $2,300 if he knew the shipper was actually paying Defendants $3,000 to transport the load.

31.     On February 13, 2023, Menchan delivered a shipment from Faribault, MN to London, KY. Prior to delivering the shipment, Vior dispatcher Andy Black emailed Menchan a secretly altered load confirmation sheet between Defendant Vior and broker Ascend LLC. The falsified load confirmation stated that the price of the load was $2,050. Ex. 9. Later, on February 27, 2023, an agent of Ascend LLC verbally confirmed that the load price was $2,200. Defendants under-reported the load price by $150 and Menchan relied on the falsified load confirmation to his detriment. He would not have agreed to take the load for $2,050 if he knew the shipper was actually paying Defendants $2,200 to transport the load.

32.     On at least two other occasions, Muhammad, directly contacted the third-party broker responsible for booking a load he hauled for Defendants. On each occasion, the broker told Muhammad that the shipper was paying Defendants a higher price for the load than Defendants told Muhammad.

33.     On at least one other occasion, a third-party broker informed Pierre that the price Defendants reported to Pierre was less than the actual price the shipper was paying Defendants. After Pierre delivered the load, Defendants paid Pierre 88% of the lower, underreported price.

34.     On at least one other occasion, a third-party broker informed Menchan that Defendants were under-reporting the load price to Menchan.

35.     Defendants' dispatchers misrepresented to Plaintiffs that the load prices they were quoting represented the actual gross revenue Defendants received for each load. Defendants then paid Plaintiffs based on the lower-falsely reported amount of the load.

36.     Plaintiffs would not have agreed to transport loads under Old Empire or Vior's carrier license and would not have paid them thousands of dollars in truck and trailer rental payments if they knew they were not being paid less than 80% or 88% of the revenue Defendants received for each load. Instead, they would have contracted with a different carrier paying as much or more than Defendants had promised to pay them.

37.     Defendant violated the TILA rules by not adhering to the terms of their lease agreements with Plaintiffs. 49 C.F.R. § 376.12 (intro paragraph).

38.     Defendants did not provide Plaintiffs a copy of the rated freight bill for each load they hauled, in violation of 49 C.F.R. § 376.12(g).

39.     Defendants deducted money from Plaintiffs' pay for an escrow account, but never repaid it to them after they stopped working for Defendants.

40.     Defendants never paid interest on any of the escrow deductions that it took from Plaintiffs' or the other putative class members' pay.

**B. Defendants Engaged In These Illegal Actions On A Classwide Basis**

41.     During the past five years alone, Defendants have collectively contracted with at least one hundred lessors/owner-operators to provide transportation service for its clients.

42.     On information and belief, Defendants have entered substantively identical lease agreements with at least one hundred drivers promising to pay them a percentage of the load price.

43.     It was Defendants' uniform policy to misrepresent to drivers through advertising and standard recruiting practices that they would pay drivers a certain percentage of the gross receipts of all loads they hauled under Old Empire or Vior's carrier license.

9

44. On information and belief, it was Defendants' uniform policy to intentionally deceive drivers into believing that the load price that Defendants' dispatchers sent on brokers' rate confirmation sheets was the actual price that Defendants received for the load.

**C. Old Empire Has Continued Its Illegal Activities Through a Separate Entity, Vior.**

45. Upon information and belief, Old Empire—which is currently not an "authorized carrier" with U.S. DOT—uses the Vior entity to enter into agreements with new drivers and displays Vior's authorized DOT number on its trucks to escape regulatory scrutiny.

46. In other words, Old Empire has merely continued its illegal business activities under the guise of a separate corporation, Vior, and is therefore liable for Vior's illegal acts in addition to its own.

47. Additionally, Vior is a successor to Old Empire under the federal common law of successor liability. Under the federal common law, a successor may be held liable if the predecessor is unable to provide the requested relief and if there has been sufficient continuity in the business operations of the predecessor and the successor.

48. The Federal Motor Carrier Safety Administration ("FMCSA") Safety Measurement System provides Carrier Measurement History Reports ("Reports") for each federally regulated motor carrier. *See* https://ai.fmcsa.dot.gov/SMS. The Reports record the number of power units and drivers assigned to that motor carrier in past months, creating a historical record of the information shown in real time through the SAFER – FMCSA management system *Cf.* ¶¶ 11, 13.

10

49. According to the Report dated October 28, 2022, Old Empire operated 101 power units and 90 drivers; less than one month later, Old Empire reportedly operated only two power units and one driver.

50. Because Old Empire drastically reduced the size of its operations and is no longer a U.S. DOT authorized carrier, it is no longer able to provide the relief requested by Plaintiffs.

51. According to the Report dated June 24, 2022, Vior operated one power unit and one driver; three months later, Vior reportedly operated 21 power units and 22 drivers. It has continued operating that number of units and drivers through February 2023.

52. Vior posts advertisements seeking drivers to its Facebook page. As recently as July 2022, Vior used the Old Empire logo, website, and email address for advertisements on its page. For example, this Old Empire advertisement seeking drivers was posted to Vior's Facebook page on July 15, 2022:



53.     Menchan signed a written lease agreement with Vior in February 2022. The agreement referred only to Vior throughout, except for one clause that mentioned Old Empire:

> 6)    During loading, the driver must pay attention to the condition of the load, and the number of pallets placed inside the trailer. If the driver observes any damage, such as bad condition of the product, broken boxes, spilling et cetera, the driver should stop the loading process and immediately inform OLDEMPIREINC.. If VIOR Transportation INC. approves of the damaged load, the driver must know the damage on the Bill of Lading, and request the signature of the shipper's representative, as proof and acknowledgement of the previous damage to the load.

54.     Pierre signed a written lease agreement with Old Empire in August 2020. Its agreement included an identical clause to the one pictured above, but referred only to Old Empire:

> 6)    During loading, the driver must pay attention to the condition of the load, and the number of pallets placed inside the trailer. If the driver observes any damage, such as bad condition of the product, broken boxes, spilling et cetera, the driver should stop the loading process and immediately inform OLDEMPIREINC.. If OLD EMPIRE INC, approves of the damaged load, the driver must know the damage on the Bill of Lading, and request the signature of the shipper's representative, as proof and acknowledgement of the previous damage to the load.

55.     Additionally, Plaintiff Menchan's truck cab displayed Vior's logo and U.S. DOT number. However, the Illinois vehicle registration provided to Mr. Menchan listed Old Empire as the owner of the vehicle. Upon information and belief, many managers and employees that previously worked for Old Empire now work for Vior.

56.     The business operations of Vior are continuous with those of Old Empire. For example, Vior uses the same form contracts as Old Empire, advertises through the same Facebook page, and employs many of the same people.

57.     Old Empire is unable to provide the relief requested and has continued its business operations through Vior, and thus Vior should be held liable as a successor to Old Empire.

## Class Allegations

58.     Plaintiffs bring this action on behalf of themselves and the following classes of similarly situated individuals or entities, defined as:

> All individuals or entities that signed a lease agreement with Defendants under either Old Empire or Vior's carrier license from April 20, 2013 to the present in which Old Empire or Vior agreed to pay the individual or entity a percentage of gross receipts of each load.

59.     The Class defined above satisfies the requirements of Rules 23(a) and 23(g).

   a. **Numerosity.** The Class is so numerous that joinder of all members is impracticable, and the disposition of their claims in a class action will provide substantial benefits to both the parties and the Court.

   b. **Commonality.** Common questions of law and fact predominate over individual issues affecting only individual class members. Questions of law and fact common to the Class include, among others, the following:

      i.   Whether Defendant intentionally misrepresented to drivers that they would pay them a certain percentage of the revenue Defendants received for each load they hauled under Old Empire or Vior's carrier license;

      ii.  Whether Defendants' breached their lease agreements with Plaintiffs by paying them less than the promised percentage of the load;

      iii. Whether Defendants refused to repay escrow deposits in violation of the TILA;

      iv.  Whether Defendants failed to pay interest on escrow deposits;

      v.   Whether Plaintiffs were consumers for purposes of the ICFA.

   c. **Typicality**. Plaintiffs' claims are typical of the Class's claims because Plaintiffs and all Class members were injured through Defendant' uniform

13

misconduct. The claims of Plaintiffs and the Class arise from the same operative facts and are based upon the same legal theories. There are no defenses unique to Plaintiffs.

d. **Adequacy.** Plaintiffs will fairly and adequately protect and represent the interests the Class because (i) Plaintiffs have retained competent and experienced counsel that have the time, experience, and resources to litigate this case; (ii) Plaintiffs are members of the Class, their claims are typical of the Class, and they have suffered substantially similar injuries to those suffered by the rest of the Class; (iii) Plaintiffs' interest in obtaining monetary relief for the Class are consistent with and not antagonistic to the interests of the Class.

60. The proposed Class satisfies the requirements of Fed. R. Civ. P. 23(b)(3).

a. **Predominance**. Common questions predominate over any individual questions because the important and prevalent issues in this case concern Defendant' conduct and its effects, which are common to the Class. Individual issues are minor and may be nothing more than damages calculations pursuant to a formula.

b. **Superiority**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages suffered by Plaintiffs and the Class, while collectively substantial, are relatively small per Class member compared to the burden and expense

required to individually litigate their claims. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Both liability and damages can be determined in one class-wide proceeding.

## **Count I - Breach of Contract**

61.    Plaintiffs incorporate all prior allegations as if fully stated herein.

62.    Defendants agreed in a written lease agreement to pay Plaintiffs a fixed percentage of the gross receipts of the loads they hauled under Old Empire or Vior's carrier license.

63.    Defendants affirmatively misrepresented to Plaintiffs that they were paying them a specified percentage of the load revenue and instead paid them less than that amount.

64.    Plaintiffs substantially performed all their obligations under their contracts with Defendants.

65.    Defendants breached their contracts with Plaintiffs by not paying them the agreed upon percentage of the rate that brokers or shippers paid to Defendant for hauling the load.

66.    Defendants also breached their contracts with Menchan by retaining Plaintiffs' final settlements when Menchan quit driving for Defendants.

15

## Count II - Truth in Leasing Act

67.     Plaintiffs incorporate all prior allegations as if fully stated herein.

68.     Defendant Old Empire is a motor carrier licensed with the U.S. Department of Transportation. Plaintiffs Muhammad and Pierre signed equipment leases with Old Empire for purposes of TILA.

69.     Defendant Vior is a motor carrier licensed with the U.S. Department of Transportation. Plaintiff Menchan signed equipment leases with Vior for purposes of TILA.

70.     Plaintiffs owned the trucks they used to drive for Old Empire or Vior, for purposes of TILA, because they leased the trucks from Old Empire or Vior and had exclusive possession and use of the trucks.

71.     Defendant Vior is a motor carrier licensed with the U.S. Department of Transportation. Plaintiffs signed equipment leases with Vior for purposes of TILA.

72.     Under the TILA regulations, an authorized carrier may perform authorized transportation in leased equipment only if the written lease granting the use of the equipment meets the requirements of 49 C.F.R. § 376.12.

73.     Under the regulations, the required lease provisions must be "adhered to and performed by the authorized carrier." *Id.* § 376.12 (introductory paragraph). The TILA also requires that carriers provide copies of the rated freight bill to owner-operators who are paid a percentage of the price of the load. *Id.* § 376.12(g).

74.     Defendants did not provide Plaintiffs a copy of the rated freight bill for each load they hauled, in violation of 49 C.F.R. § 376.12(g).

16

75.     In the Lease Agreements, Defendants agreed to pay Plaintiffs and the other owner-operator drivers a certain percentage of gross revenue for each load they hauled for Defendants.

76.     Defendants falsely represented the actual prices of the loads in order to pay Plaintiffs and the other owner-operator drivers less than the amount promised in their Lease Agreements.

77.     Defendants did not adhere to the terms of the lease agreements because they paid Plaintiffs less than the percentage of the load rate that Defendants promised to pay them.

78.     Defendants violated the TILA by not paying interest on escrow deductions and by refusing to return Plaintiffs escrow deposits.

79.     Under 49 U.S.C. § 14704(a)(2), Defendants are liable to Plaintiffs for the damages that they suffered on account of Defendants' regulatory violations.

## Count III – Illinois Consumer Fraud And Deceptive Business Practices Act

80.     Plaintiffs incorporate all prior allegations as if full stated herein.

81.     Defendants advertised to Plaintiffs and the general public that it would pay drivers a fixed percentage of the revenue for each load that the drivers transported under Defendants' carrier licenses if Plaintiffs leased a truck from Defendants.

82.     Plaintiffs are "consumers" under the ICFA because Menchan and Muhammad leased a truck from Defendants and because all Plaintiffs contracted with Defendants for the provision of services, namely the service of dispatching and negotiating loads and allowing Plaintiffs to drive under Defendants' carrier licenses. *See* 815 ILCS 505/1(b), (e).

83.     Defendants' recruiters affirmatively misrepresented to Plaintiffs that they would receive either 80% or 88% of the load revenue and Defendants would keep either 20% or 12% of the load revenue if Plaintiffs entered into carrier agreements with Defendants.

84.     Defendants' dispatchers affirmatively misrepresented to Plaintiffs that the load prices they quoted to Plaintiffs for each load reflected the actual total load revenue, when in fact Defendants' dispatchers lied and underreported the price of most loads.

85.     At times, Defendants deceived Plaintiffs by sending them altered load confirmation sheets from third party freight brokers.

86.     Defendants intended that Plaintiffs rely on their reports of the gross revenues so that Defendants could pay Plaintiffs less than the amounts they were owed under their equipment leases. Plaintiffs relied on these misrepresentations.

87.     Defendants engaged in both deceptive practices and unfair business practices in the conduct of their business, in violation of 815 ILCS §§ 505/2, 510/2(a), by engaging in the acts and practices alleged herein.

88.     Plaintiffs reasonably believed, based on Defendants' representations, that Defendants were paying them the agreed upon percentage of the revenue Defendants received for each load.

89.     Defendants' actions implicated consumer protection concerns.

90.     Plaintiffs were injured by Defendants' unfair and deceptive acts because they were not paid the amount that Defendants promised to pay them.

91.     Plaintiffs were injured by Defendants' unfair and deceptive acts because they would not have transported loads for Defendants if they knew Defendants were retaining more

18

than the agreed upon share of the load price. Instead, they would have driven for a different carrier that paid more money.

### Count IV – Common Law Fraud

92.    Plaintiffs incorporate all prior allegations as if fully stated herein.

93.    Defendants made numerous false statements to Plaintiffs and the Class concerning the actual freight rates, or prices of the loads, that Defendants' customers paid Defendants for drivers' deliveries.

94.    Defendants altered load confirmation sheets to make the load prices appear lower than the prices that Defendants' customers actually paid to Defendants.

95.    Defendants then sent the fraudulent load confirmation sheets to Plaintiffs and the Class to make them falsely believe that Defendants were paying them in accordance with their work contracts.

96.    Defendants knowingly provided Plaintiffs and the Class with falsified load confirmations.

97.    Plaintiffs and the Class had no reason to question the authenticity of the fraudulently modified load confirmation sheets.

98.    For example, Defendants carefully altered the load confirmations to be virtually identical in appearance to the brokers' original load confirmations, and the load confirmations generally were on the broker's original letter head or otherwise bore the given issuing broker's logo.

99.    Plaintiffs and the Class reasonably and justifiably relied upon the false load confirmation sheets as though they were authentic.

19

100.    Plaintiffs and the Class incurred substantial damages in the form of underpayments for the services they offered because of Defendants' fraud.

101.    Defendants' conduct was fraudulent, egregious, and malicious and justifies an award of punitive damages.

## **Prayer for Relief**

Plaintiffs, individually and on behalf of the Class, respectfully pray for the following relief:

a.   An order certifying the Class as defined above, appointing Plaintiffs' counsel as Class Counsel, and appointing Plaintiffs as class representatives;

b.   An award of all economic, monetary, actual, consequential, and compensatory, damages available under the law;

c.   An award of restitution and disgorgement;

d.   An award of all equitable relief requested herein;

e.   An award of reasonable litigation expenses and attorneys' fees;

f.   An award of pre- and post-judgment interest, to the extent allowable; and

g.   Other further relief that the Court deems just and reasonable.

## **Jury Demand**

Plaintiff demands trial by jury on all issues as to which a jury trial is available.

Date: April 20, 2023                    Respectfully submitted,

                    /s/ Christopher J. Wilmes
                    One of the Attorneys for the Plaintiff

Christopher J. Wilmes
cwilmes@hsplegal.com
Tex Pasley
tpasley@hsplegal.com
Hughes Socol Piers Resnick & Dym
70 W. Madison St., Ste. 4000
Chicago, IL 60602
(312) 580-0100